DECISION
LFGC, LLC (Plaintiff) appeals the real market value (RMV) of the property identified as Clackamas County Assessor's Account 00835065 for tax year 2007-08. A trial was held on July 8, 2009. Jack Orchard, Attorney at Law, appeared on behalf of Plaintiff. Chris Maletis (Maletis), co-owner of Plaintiff, and Richard Zbranek (Zbranek), certified appraiser, testified on behalf of Plaintiff. Kathleen Rastetter, Senior County Counsel, appeared on behalf of Defendant. Ronald Saunders (Saunders), registered appraiser, testified on behalf of Defendant.
 I. STATEMENT OF FACTS
The subject property, Langdon Farms Golf Club, is the land and structures of a public, daily-fee golf course located at 24377 NE Airport Road, Aurora, OR 97002. (Ptf's Ex 1-29.) Both Zbranek and Saunders agree that the highest and best use of the property is, as currently improved, an income-generating golf course. (Ptf's Ex 1-40; Def's Ex A-30.)
The golf course is considered to be average to above average for overall appeal and competitive design, and Zbranek testified that the golf course is physically above average. The Portland Business Journal readers in February 2009, rated the golf course the number one course to host a tournament or corporate event for the fifth year in a row. (Def's Ex A-10.) The golf course is located outside of the Urban Growth Boundary, and, as a result, "must depend upon *Page 2 
extending its reputation to the greater Portland/Vancouver golfing area." (Ptf's Ex 1-27.) "[A]pproximately 1/3 of [the] total annual rounds [of golf are] comprised of tournament rounds," and Zbranek testified that the golf course is the type and quality that caters to outings and events. (Id.) The golf course has a clubhouse that is a multi-purpose facility with a commercial kitchen. (Ptf's Ex 1-34.) The course also has a special events building, called the Red Shed, that is approximately 6,000 square feet and is used to accommodate larger events. (Id.)
Plaintiff is the corporate business entity that owns and operates the golf course. Maletis testified that he was a partial owner of the golf course at the time the golf course was constructed, and that Maletis and his brother, Tom Maletis, purchased a 100 percent interest in the golf course on January 1, 2002, for $10,200,000.
Both Plaintiff and Defendant provided appraisal reports in support of their determinations of the RMV of the subject property. Plaintiff's appraisal report, prepared by Zbranek and Timothy Garey (Garey), concluded that the RMV, as of January 1, 2007, was $3,040,000. (Ptf's Ex 1-62.) Defendant's appraisal, prepared by Saunders, concluded that the RMV of the property as of January 1, 2007, was $6,148,249. (Def's Ex A-44.) Both appraisals did not include a cost approach to determine RMV because market participants give that approach little weight. (Ptf's Ex 1-42; Def's Ex A-31.)
Both appraisals placed primary weight on the income approach and secondary weight on the sales comparison approach. (Ptf's Ex 1-61; Def's Ex A-44.) Zbranek's appraisal report stated that he favored the use of an income capitalization approach because "[n]ot only does this approach represent the most direct and accurate simulation of market behavior, it is the method explicitly employed by buyers and sellers in acquisition and disposition decisions." (Ptf's Ex 1-62.) Saunder's appraisal report supported his use of the income capitalization *Page 3 
approach with the statement that "[t]he income approach reflects the [market's] perception of the relationship between a property's potential income and its market value. * * * [That] approach is widely applied when appraising income-producing properties." (Def's Ex A-32.)
From 2003 to 2007, Plaintiff's net operating income (NOI) increased. The following table includes Plaintiff's gross revenue, total expenses, NOI, NOI as a percentage of gross revenue, and the expenses as a percentage of gross revenue (expense ratio) for those years as
reported by Zbranek and Saunders in their appraisal reports.

Year Total Gross Total Expenses (Including NOI NOI as % of Expense
 Revenue Cost of Goods Sold) Gross Revenue Ratio
2003* $3,658,994 $3,627,763 $31,231 0.90% 99.10%
2004* $3,654,568 $3,458,423 $196,145 5.40% 94.60%
2005* $3,760,441 $3,562,311 [including $198,130 5.30% 94.70%
 $21,992 in Golf Cart Lease]
2005** $3,760,441 $3,540,318 $220,123 5.90% 93.10%
2006* $3,843,306 $3,442,773 [including $400,533 10.40% 89.60%
 $52,781 in Golf Cart Lease]
2006** $3,843,306 $3,389,992 $453,314 11.80% 88.2%***
2007** $4,039,644 $3,424,341 $615,303 15.20% 84.8%***

* Data provided in or derived from Plaintiff's Exhibit 1 at 51.
** Data provided in or derived from Defendant's Exhibit A at 34.
*** Includes cost of goods sold expenses which Defendant omitted from its expense ratio percentage.
The Total Expenses for each year included real property taxes as follows: $97,884 in 2003, $92,805 in 2004, $97,730 in 2005 and $67,683 in 2006. (Ptf's Ex 1-51.) Plaintiff's appraisal report reported a different amount for real property taxes for tax year 2005 and 2006 ($79,719). (Ptf's Ex 1-54.) Langdon Farms Golf Club Consolidated Income Statements for the Years ended November 2006 and 2005, respectively, reported real property taxes of $67,484 and $90,209. (Def's Ex D-1.)
Zbranek and Saunders presented differing values for the total expenses for 2005 and 2006. In Zbranek's line-item expense table, he included "Golf Cart Lease" in addition to the other expenses that he used to determine total expenses. (Ptf's Ex 1-51.) Saunders testified that *Page 4 
when he received income statements from Plaintiff, he did not notice the golf cart leases on the statements.
Plaintiff's appraisal report forecast revenue of $3,867,750 for 2007. (Ptf's Ex 1-53.) Zbranek supported that forecast amount through evidence showing that the revenue trended upward year to year, which suggested that revenue would continue to trend up for the forecast year.
Zbranek forecast numerous line-item expenses to determine a forecast total expenses amount of $3,476,227. (Ptf's Ex 1-56.) To determine those expenses, Zbranek "relied on the historical expenses of the subject property along with referencing confidential operating statements of other similar daily fee and semi-private golf clubs[.]" (Ptf's Ex 1-53.) Specifically included within the line-item expenses were $96,694 for management and $270,000 for general and administrative payroll, although no amount was included for real estate taxes. (Ptf's Ex 1-54; 56.) From the $3,867,750 forecast revenue, Zbranek subtracted the $3,476,227 forecasted expenses to determine an NOI of $391,523. (Ptf's Ex 1-56.)
Zbranek's appraisal report determined a base capitalization rate of 9.5 percent. (Ptf's Ex 1-59.) To that 9.5 percent capitalization rate, Zbranek added the tax rate of 1.2934 percent to reach a total capitalization rate of 10.7934 percent. (Ptf's Ex 1-60.) Zbranek testified that he and Garey were able to determine the tax rate because they knew what the assessment of the property was and knew what the taxes were. Zbranek's appraisal report then divided the NOI of $391,523 by the 10.7934 percent total capitalization rate to reach Plaintiff's estimated RMV of $3,627,429, which Zbranek rounded to $3,630,000. (Ptf's Ex 1-56.)
From the $3,630,000 RMV, Zbranek subtracted a depreciated value of personal property of $591,731 to compute the subject property's RMV of $3,038,269. (Id.) The appraisal report *Page 5 
provided no explanation for the source of the personal property value. At trial, Zbranek testified that he obtained the personal property amount from Defendant's assessment. Saunders disputed the personal property value that Zbranek included in his appraisal report.
Zbranek's appraisal report also used a sales comparison approach, but the appraisal report stated that the sales comparison approach only supported, rather than determined, the RMV. Zbranek's appraisal report included data from 36 national sales of both public and private courses. (Ptf's Ex 1-43.) His appraisal report stated that "[g]eographically comparable sales were not found; therefore, * * * [the appraisal report] utilized the most recent sales that would be considered comparable in terms of income relationships." (Ptf's Ex 1-45.) The sales comparison approach of Zbranek's appraisal report produced a range that estimated that the RMV, including personal property, would be between $3,600,000 and $3,900,000. (Ptf's Ex 1-47.) Zbranek concluded that "we have not relied on these [comparable] sales in order to conclude a price per hole, only to provide a supporting range of value, capitalization rates and NOI estimates." (Ptf's Ex 1-43.)
Saunders forecast revenue for 2007 of $4,000,000 because total gross revenue trended an annual increase from 2004 to 2007. (Def's Ex A-32, 34.) The sales comparison approach of Saunders's appraisal report indicated expenses ratios ranging between 55 percent and 95 percent for comparable properties. (Def's Ex A-32.) Saunders testified that by examining several golf sales in Oregon and Washington, the expense ratio generally ranged from 70 percent to 90 percent. From that range, he forecast an expense ratio of 85 percent. (Id.) Saunders testified that, because Plaintiff operates a well-maintained facility and forecasts 45,000 rounds of golf, the facility should operate in the middle of the expense ratio range provided by comparable sales. Saunders testified that Zbranek's appraisal report forecasts a higher expense ratio than stated in *Page 6 
his appraisal report because Zbranek only considered Plaintiff's historical information and did not compare the property's expense ratio to information from other market sales, specifically noting that there were numerous sales in the local market that Zbranek chose not to consider. Saunders also testified that a 90 percent expense ratio appears to be reasonable if the appraiser looked exclusively at Plaintiff's historical information. Saunders further testified that he did not analyze each line-item expense in reaching the 85 percent expense ratio, but that this percentage included all forecast expenses, including any golf cart leases.
Saunders multiplied the $4,000,000 forecast revenue by the 85 percent expense ratio to determine forecast expenses of $3,400,000. (Def's Ex A-32.) Because the actual NOI for the golf course in 2007, which was $615,303, was close in amount to the $600,000 NOI that Saunders determined to be the difference between the forecast revenue and forecast expenses, Saunders used the actual NOI for 2007 to calculate the RMV of the property. (Def's Ex A-32, A-33.) Saunders divided the $615,303 NOI by a capitalization rate of 9.5 percent to estimate a RMV of $6,476,874. (Def's Ex A-33.) He then subtracted $328,625 from that value, which was the personal property value on the tax roll, to determine a real market value of the real property of $6,148,249. (Def's Ex A-44.) Saunders testified that the $6,148,249 included taxes in the forecast expenses. Saunders testified that he realized when reviewing the appraisal report that he should not have included taxes in the forecast expenses, but that he should have excluded that expense and "loaded the capitalization rate" by the tax rate. Saunders testified that, when he removed taxes from the expenses, the NOI of $695,022, which he divided by the loaded capitalization rate, resulted in an RMV of $6,441,385. Saunders did not state how he calculated the tax rate or the amount of the tax rate. However, Saunders concluded that his total capitalization rate was approximately the same tax rate used by Zbranek. *Page 7 
Saunders's appraisal report also includes a sales comparison approach that examined Oregon and Washington sales "over the past several years with varying degrees of comparability." (Def's Ex A-35.) The appraisal report stated that "price increases [in the sales of golf courses] are related more to specific property performance than just the market conditions in general[.]" (Def's Ex 1-40.) The appraisal report also stated that the comparable sales approach indicated a wide range of values, between "$300,000 and $400,000 per hole," due to the limited comparability of the market data. (Def's Ex A-43.) From that value range, Saunders estimated a value of $350,000 per hole, for a total estimated RMV of $6,300,000. Saunders testified that he placed exclusive weight on the income approach to determine the ultimate RMV conclusion because the income approach required less subjective adjustments. Saunders further stated that golf courses "do not tend to have good comparables" for the sales approach, but that approach nonetheless provides a bracket to determine if the RMV is reasonable.
During testimony, Zbranek, Saunders, and Maletis discussed the inclusion of expenses for golf course management in the determination of RMV. Maletis testified that, in 2002, Plaintiff employed OB Sports (OB) as an external management company. Maletis testified that in 2002, OB "got rid of" the general manager who had previously been managing the golf course. Maletis testified that, in March of 2003, he and his brother took over management of the golf course. They fired OB due to OB missing its budget in 2002 and creating additional management problems. Maletis testified that neither he nor his brother were paid for the management services that they provided and that Plaintiff's financial information did not reflect the value of those services. Maletis re-hired OB in 2008 and pays OB a management fee of $78,000. In 2008, OB hired a general manager, who is paid $120,000. / / / *Page 8 
Zbranek's appraisal report stated that "[i]t is widely accepted today that managing agents are hired by owners to operate a property in return for a management fee. * * * Purchasers of these types of properties as real estate investments are able to passively own the property by employing a managing agent[.]" (Ptf's Ex 1-62.) Zbranek further testified that it is typical for a golf course to pay both a management company and a general manager because such a complex operation requires both the management expertise and oversight of a management company and the day-to-day running of the business that a general manager provides.
Although Plaintiff had not employed a management company since 2003, Zbranek forecast a specific expense of $96,694 in 2007 for "management." (Ptf's Ex 1-56.) Zbranek testified that a standard management fee was between 2 and 2.5 percent of the gross revenue, and that he determined the $96,694 management expense by taking 2.5 percent of the forecast revenue. Zbranek testified that he did not obtain data relating to management fees for comparable regional courses. He testified that national comparables and information that he received from people working in the industry concerning trends in management fees support a management fee ranging between $75,000 and $150,000 for a public, daily-fee golf course similar to the subject property. Zbranek additionally supported the inclusion of the expense in his appraisal report by testifying that, if an owner is managing a property, then that expense should be recorded as a management fee.
Zbranek's appraisal report only provided information concerning one comparable golf course that included a management expense. That course was semi-private and the management expense accounted for two percent of the course's revenue. (Ptf's Ex 1-50.) The appraisers agreed that Stone Creek, a public golf course owned by Clackamas County, paid a management fee that was two percent of total revenue. *Page 9 
Zbranek testified that his appraisal report included the cost of employing a general manager within the $270,000 forecast general and administrative payroll, although Zbranek did not state a specific amount for that cost and did not break it out from the $270,000. Zbranek testified that he determined the entire $270,000 general and administrative payroll expense by considering the historic general and administrative payroll expenses of Plaintiff and the general and administrative payroll expenses of comparable golf courses, which included the cost of paying a general manager. According to Zbranek's appraisal report, general and administrative payroll as a percentage of gross revenue had increased from 5.3 percent in 2003 to 6.2 percent in 2004 and to 6.9 percent in 2005 and in 2006. (Ptf's Ex 1-51.) Zbranek's appraisal report also included general and administrative payroll expenses for comparable golf courses that included the following percentages of gross revenue: 2.0 percent, 3.9 percent, 5.7 percent, and 8.1 percent. (Ptf's Ex 1-50.) A semi-private course reported the 8.1 percent general and administrative payroll expense. (Id.) Zbranek testified that the average cost of employing a general manager for a daily-fee golf course ranged between $75,000 and $150,000.
Saunder's appraisal report neither explicitly included nor excluded a management fee. Saunders testified that he was not sure that Plaintiff needed the services of a general manager or a management company and that, considering the data, there were likely just as many examples of golf courses that did not have management companies as there were examples of golf courses that did have management companies. Saunders admitted that he did not have any expertise in the management of a golf course and could not testify whether or not it would be reasonable for Plaintiff to pay the management fee and general manager salary that Zbranek forecast. Saunders testified that a golf course would pay for competent management, but that he did not know what that amount would be. *Page 10 
Neither Zbranek nor Saunders used a discounted cash flow method to calculate the RMV of the subject property. Zbranek testified that a discounted cash flow method is preferable when the income stream is not stable. He also testified that, throughout the period examined, expenses fluctuated somewhat while revenue remained stable. Saunders testified that he did not consider the net operating income to be stabilized. Saunders's appraisal report stated that the subject property's reported actual NOI for 2007 was "judged to be the best indicator of stabilized net operating income for the purposes of valuation." (Def's Ex A-32.) Saunders testified that he would have performed a discounted cash method approach if he had time.
 II. ANALYSIS
At issue in this case is the RMV of the subject property for tax year 2007-08. RMV is defined in ORS 308.205(1), [1] which reads:
 "[RMV] of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."
There are three methods used to determine RMV: (1) the cost approach; (2) the sales-comparison or market comparable sales approach; and (3) the income approach. Allen v. Dept. of Rev.(Allen), 17 OTR 248, 252 (2003).See also OAR 150-308.205-(A)(2) (stating that all three approaches to valuation of real property must be considered, although all three may not be applicable to the valuation of the subject property).
Zbranek and Saunders agree on the following points: (1) the highest and best use of the property is its current use as a golf course; and (2) the cost approach is not an appropriate method of valuation for the subject property. Both Zbranek and Saunders agree that the appropriate capitalization rate to be used in the income approach is 9.5 percent, and they both testified that *Page 11 
a tax rate of 1.29 percent is added to the 9.5 percent to reach a total capitalization rate of 10.79 percent. Both appraisers removed the personal property assessment from the RMV that was determined using the income approach.
To determine the RMV, this court will first discuss the requirements of the burden of proof that will guide the court's analysis of the evidence presented, and second, examine the two approaches that the appraisers used to determine the RMV.
A. The Burden of Proof
As the party seeking affirmative relief, Plaintiff bears the burden of proof. ORS 305.427. A preponderance of the evidence, meaning the greater weight of evidence or the more convincing evidence, is sufficient to sustain the burden of proof. Id.; Feves v. Dept. of Rev., 4 OTR 304, 312
(1971). The evidence presented must be competent evidence, and evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. Woods v. Dept. of Rev., 16 OTR 56, 59 (2002); Reed v.Dept. of Rev., 310 Or 260, 265, 798 P2d 235 (1990). In order to sustain the burden of proof, Plaintiff must provide competent evidence supporting Plaintiff's determination of the RMV. Plaintiff met its burden of proof.
B. Valuation
Zbranek's and Saunders's appraisal reports used both an income approach and a sales comparison approach to determine the RMV of the subject property. Those approaches will be examined separately.
C. The Income Approach
The income approach relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income [that the property will produce]." Allen, 17 OTR at 253 (citation omitted). Both appraisal reports placed primary emphasis on the income *Page 12 
approach, stating that the income approach provided the most accurate simulation of market behavior and that the income approach is widely used when appraising income-producing properties. (Ptf's Ex 1-62; Def's Ex A-32.) Although there are two techniques for determining the expected future income, direct capitalization and discounted cash flow, both appraisal reports relied upon the direct capitalization analysis approach to determine the RMV of the subject property.
1. Direct Capitalization
The income approach determines the flow of income that a reasonable and knowledgeable buyer would anticipate if purchasing the subject property on the assessment date. Pacific Power Light Co. v. Dept. of Rev.(Pacific Power), 286 Or 529, 542, 596 P2d 912 (1979). The income approach should also consider the past earnings of the subject property and the rate of change of its income. Id.
To determine the RMV of a property, the direct capitalization analysis divides the forecast NOI of the property for the tax year by the capitalization rate, which both appraisers testified to be 10.79 percent. The parties dispute the amount of the forecast NOI and the value of the personal property that must be removed from the RMV determination in order to determine the RMV of the subject property. To determine the forecast NOI, the parties each forecast amounts for total gross revenue and total expenses for the golf course. Both appraisers, to some extent, considered historical information of the subject property in the process of generating forecast revenue and forecast expenses. Zbranek considered historical information from 2003 to 2006 while Saunders considered information from 2004 to 2007. *Page 13 
Plaintiff challenged Saunders's appraisal method because it used Plaintiff's 2007 fiscal data that would be unknown to a purchaser as of January 1, 2007. Defendant contends that the Uniform Standards of Professional Appraisal Practice (USPAP) allows a retrospective analysis to use data of events subsequent to the assessment date. "Data subsequent to the effective date may be considered in developing a retrospective value as a confirmation of trends that would reasonably be considered by a buyer or seller as of that date." The Appraisal Foundation, UniformStandards of Professional Appraisal Practice U-82 (2008-09 Ed).
The Oregon Supreme Court allowed the use of actual income for the tax year under appeal for purposes of determining the RMV. See Pacific Power
at 544 (accepting the use of the actual income figures for the year in question where the forecast amounts are close to the actual amounts and the parties do not criticize the court's use of the actual income figures as opposed to figures determined by the appraisal); Mt. Bachelor v.Dept. of Rev. (Mt. Bachelor)., 273 Or 86, 92-93, 539 P2d 653 (1975) (accepting the use of the actual income figures where the forecast income is close in amount to the actual figures and "was employed as a concession to plaintiff.") The courts in both Pacific Power and Mt.Bachelor specified that the courts were not suggesting that the use of the actual income of the property was the proper predictor of income for determining the RMV of the property. Pacific Power, 286 Or at 544; Mt.Bachelor, 273 Or at 92. In both cases, the courts qualified their use of actual income and expenses reported after the date of assessment, stating that there was no objection raised or it was a "concession to plaintiff."Mt. Bachelor at 93. That is not the case here where Plaintiff objects to Defendant's use of 2007 actual income and expenses.
The parties' concerns will be incorporated in the court's forecast revenue and expense analysis that follows. *Page 14 
2. Forecast Revenue
Both Zbranek and Saunders forecast amounts of total gross revenue by stating that the total gross revenue for the subject property continuously rose throughout the period examined, although the parties differed regarding what period of years they used to generate their forecast amounts. Saunders examined the 2004-07 period, while Zbranek examined the 2003-06 period. Over the 2003-06 period, total gross revenue changed each year by the following amounts: ($4,426) from 2003 to 2004; $105,873 from 2004 to 2005; and $82,865 from 2005 to 2006. (Ptf's Ex at 1-51.)
Zbranek forecast total gross revenue of $3,867,750 for 2007. (Ptf's Ex 1-56.) That forecast amount is an increase of $24,444 over the $3,843,306 total gross revenue for 2006. Zbranek testified that his forecast was small in comparison to the increases in gross revenue that had occurred the past two years because he factored in the decrease in total gross revenue that occurred between 2003 and 2004 when forecasting the total 2007 gross revenue. From 2004 to 2006, total gross revenue annually increased by an amount between three and four times as large as the increase that Zbranek forecast. Nothing in the record suggests that the total gross revenue for 2007 would not continue to rise. Although the decrease in gross revenue that occurred between 2003 and 2004 and the reduced growth rate between 2005 and 2006 are worth noting, a reasonable forecast of gross revenue would place greater emphasis on the trend of increasing gross revenue that occurred from 2004 to 2006 unless there were known factors to conclude to the contrary. No evidence to the contrary was submitted to the court.
Saunders forecast total gross revenue of $4,000,000 for 2007, which is an increase of $156,694 over the total gross revenue for 2006. Without further explanation, the $4 million total gross revenue that Saunders forecast appears to be a simple, round number rather than an *Page 15 
accurate estimate of the 2007 expected golf course revenue. The forecast total gross revenue increase of $156,694 over the total gross revenue of 2006 is slightly less than one and a half times the largest increase seen throughout the period (2004-06), and nearly double the increase that occurred between 2005 and 2006. With the decline in golf course revenue from 2005 to 2006, it is unlikely without subsequent knowledge of actual 2007 golf course revenue, that the estimated growth would substantially exceed any recorded increase in the two prior years. A forecast that large overestimates a reasonable prediction.
This court finds that, after considering Maletis's testimony detailing his management of the property and the decline in the growth of gross revenue between 2005 and 2006, a reasonable 2007 forecast for total gross revenue is $3,937,467, an increase of $94,161 over the total gross revenue of 2006.
3. Forecast Expenses
The parties differed significantly in their methods of forecasting total expenses. Zbranek forecast line-item expenses to determine total expenses of $3,476,227, while Saunders forecast an expense ratio of 85 percent, which he multiplied by the $4 million forecast total gross revenue to determine forecast total expenses of $3,400,000. Zbranek's appraisal report stated that the appraiser determined the forecast expense by relying on the historical expenses of the golf course and also the operating statements of other similar golf clubs. Saunders criticized Zbranek's appraisal report for not taking into account market data. (Ptf's Ex 1-53.) Zbranek criticized Saunders's appraisal report for not placing enough reliance on the historical operations of the subject golf course and oversimplifying the determination of expenses by calculating the expense ratio without considering line-item expenses. *Page 16 
"To calculate the NOI, appraisers look at historical gross income and expenses for the subject [property], adjusted by reference to market data." Allen, 17 OTR at 254. In order to forecast total expenses, a number of issues concerning the historical expenses of the property must be clarified.
A discrepancy exists in the historical expenses that the appraisers presented in their appraisal reports. In 2005, the total expenses for the two appraisals differ by $21,992, and, in 2006, the total expenses for the two appraisals differ by $52,782. (Ptf's Ex 1-51; Def's Ex A-34.) The amount by which those expenses differ is equal to the amount of "Golf Cart Leases" included in Zbranek's appraisal report.[2] (Ptf's Ex 1-51.) Saunders testified that he was never provided specific information concerning golf cart leases. Because the cost of leasing golf carts is a reasonable operating expense for the subject property, the amount of the historical total expenses for 2005 and 2006 that will be used to forecast total expenses is the amount listed in Zbranek's appraisal report.
Because the parties agree that taxes should not be included in the forecast expenses, the historic total expenses and the expense ratios of the historic information must be adjusted accordingly to provide accurate information from which total expenses and expense ratios can be forecast. The following table includes these adjusted figures.
 Total gross Expenses with Expenses
Year revenue* Taxes* Taxes* without Taxes
2003 $3,658,994 $3,627,763 $97,884 $3,529,879
2004 $3,654,568 $3,458,423 $92,805 $3,365,618
2005 $3,760,441 $3,562,311 $97,730 $3,464,581
2006 $3,843,306 $3,442,773 $67,683 $3,375,090

* (Ptf's Ex 1-51.) *Page 17 
Saunders testified that the recent golf course sales in Oregon and Washington that he included in his appraisal report listed expense ratios between 70 percent and 90 percent. Saunders explained that, because Plaintiff operated a well-maintained facility and expected 45,000 rounds of golf, Plaintiff's expense ratio should be in the middle of that range. Saunders' testimony did not explain the correlation between a middle-of-the-range expense ratio and the maintenance of the golf course and the forecast rounds of golf. Golf courses are expensive to operate because of the maintenance and other related costs required to keep the course playable year round. Nothing in the testimony or analysis contained within the appraisal report indicates that Saunders considered the historical expense ratios of the subject golf course.
Zbranek testified that his forecast expenses included the cost of employing a general manager and the cost of paying a management fee to a management company. Saunders testified that he did not believe that that was an expense that every golf course would incur, but also that he had no knowledge of the operations of a golf course. Golf courses are complex operations, especially golf courses such as the subject, that are heavily dependent upon attracting events and tournaments. The subject property requires not only running the day-to-day operations of the business, but, according to Maletis, hosting events and tournaments requires coordinating numerous teams of employees and logistical planning that involves management oversight of the entire operation.
Saunders presented no evidence demonstrating what a golf course would reasonably pay for management services. The evidence in the record concerning reasonable expenses for management are the amounts that Plaintiff presently pays, the amounts paid by other golf courses, and Zbranek's expert testimony describing trends of management costs. Although the amounts that Plaintiff presently pays OB and the general manager provide insight into what a *Page 18 
golf course will pay for management in 2008, those expenses do not necessarily equate dollar for dollar to reasonable 2007 management expenses.
Zbranek forecast a management fee, included in the forecast expenses under the title "Management," in the amount of $96,694, or 2.5 percent of the forecast gross revenue. (Ptf's Ex 1-56). Zbranek testified that a reasonable management fee should be between 2 percent and 2.5 percent of the gross revenue. The only evidence of a reasonable management fee that was included in Zbranek's appraisal report was the two percent of gross revenue fee that the semi-private course paid. (Ptf's Ex at 1-50.) Zbranek testified that Stone Creek, the public course owned by Clackamas County, also paid a management company two percent of its gross revenue. The Stone Creek evidence is persuasive because it is a public course located within the same county as the subject property. Without any other evidence to support the $96,694 amount that Zbranek included in his forecast expenses and no evidence to the contrary offered by Defendant, the court finds that a management fee of $78,749, or two percent of gross revenue, would be a reasonable expense.
Zbranik forecast an expense for general and administrative payroll of $270,000, which is seven percent of the total forecast gross revenue. Zbranik's appraisal report presented general and administrative payroll expenses for comparable golf courses and Plaintiff's historic general and administrative payroll expenses. Similar expenses for comparable properties ranged between 2.0 percent and 8.1 percent of total gross revenue, and only a semi-private course's expenses exceeded 5.7 percent. (Id.) The subject property's historic general and administrative payroll expenses rose from 5.3 percent to 6.9 percent for the period. (Ptf's Ex 1-51.) Zbranek testified that he forecast a general and administrative payroll expense of a greater percentage of gross revenue than the historic expenses partly due to the general manager's salary. The amount *Page 19 
of that salary was not accounted for separately from the entire general and administrative payroll amount. As a result, there is no way to determine whether the forecast general manager's salary is reasonable or unreasonable.
Saunders did not forecast a line-item expense for general and administrative payroll, nor did Saunders present any evidence demonstrating what a reasonable amount for that expense would be because he did not conclude that a management fee was a reasonable expense.
Based on Maletis's testimony and the evidence, it is reasonable to conclude that the subject property would incur general and administrative payroll expenses. The court gives more weight to the subject property's historic general and administrative payroll expense data than the data of comparable golf courses located outside the region. Considering general and administrative payroll expenses as a percentage of gross revenue, a general and administrative payroll expense of $255,935, or 6.5 percent of the forecast gross revenue, is reasonable.
The reduction of Zbranek's forecast expenses for management and general and administrative payroll to $78,749 and $255,935, respectively, reduces Zbranek's forecast total expenses to $3,444,214, resulting in the total forecast expense being 87.4 percent of the forecast gross revenue, $3,937,467. Saunders's appraisal provided an expense ratio range of between 70 percent and 90 percent for comparable properties. Because that range was determined by considering the operations of comparable properties, an expense ratio that falls within that range is reasonable. An 87.4 percent expense ratio falls within that range and is in keeping with the downward expense ratio trend of prior years for the subject property, and, therefore, is a reasonable expense ratio. *Page 20 
4. Direct Capitalization RMV Determination
By subtracting the $3,444,214 forecast expenses from the $3,937,467 forecast revenue, a NOI of $493,253 is forecast.
Both parties testified that 10.79 percent is an appropriate capitalization rate to use for the income approach. Although Zbranek testified that he was able to determine the tax rate because he knew what the assessment of the property was and knew what the taxes were, no other evidence was presented concerning how the tax rate was determined. With no evidence to the contrary, the court accepts the parties' capitalization rate.
The NOI, $493,253, divided by the 10.79 percent capitalization rate results in a total RMV for the property of $4,571,390. The value of personal property must be removed from the $4,571,390 value in order to calculate the RMV of the subject real property. Because no evidence in support of Zbranek's personal property value, $591,731, was offered, the court cannot accept that value. Saunders relied on the personal property value of $328,625, stated on the tax roll. (Def's Ex A-59.) There was no evidence offered to show that the personal property value on the tax roll was incorrect. After removing the personal property value of $328,625 from the $4,571,390, the RMV of the subject real property is $4,242,765. D. Discounted Cash Flow
Neither appraisal report used the discounted cash flow analysis to determine the RMV of the subject property. Although Zbranek testified that the discounted cash flow technique was preferable where the income stream for the property was not stable, he justified his decision not to use a discounted cash flow analysis by stating that, in his expert opinion, the income stream was stable. *Page 21 
Saunders, by contrast, testified that the income stream was not stable, and, as a result, a discounted cash flow analysis should have been used to determine the RMV of the property. Saunders's testimony is inconsistent with his appraisal report. Saunders's appraisal report did not use a discounted cash flow method to determine the RMV of the property, nor did that appraisal report mention that a discounted cash flow method would be preferable. Instead, Saunders's appraisal report used the direct capitalization method, and expressly stated that the reported actual NOI for 2007 is "judged to be the best indicator of stabilized net operating income for the purposes of valuation." (Def's Ex A-32.) The only explanation given by Saunders for why his appraisal report did not undertake a discounted cash flow to determine the RMV was that he lacked time.
If the discounted cash flow analysis was preferable to the direct capitalization analysis, it should have been the method selected in the place of the direct capitalization analysis by each appraiser. Because neither Zbranek nor Saunders used a discounted cash flow method, the direct capitalization method is the only method available to determine real market value.
E. The Sales Comparison Approach
If there is relevant comparable sales information, the sales comparison method is used in the process of determining the RMV. Swenson v. Dept. ofRev., 276 Or 1, 4 (1976). The sales comparison approach can also be used to support the conclusions of the income approach. Appraisal Institute,The Appraisal of Real Estate 301 (13th ed 2008). Both Zbranek and Saunders explicitly stated in their appraisal reports that they placed less weight on the sales comparison approach than they placed on the income approach.
The subject golf course is particularly unique within the category of golf courses. Both appraisal reports highlighted the golf course's excellent physical condition. The golf course's *Page 22 
location outside of the Urban Growth Boundary has forced the course, unlike other public golf courses, to rely heavily on the attraction of tournaments and events. In order to attract those tournaments and events, Plaintiff must distinguish this golf course from other regional courses, which Plaintiff has done with its unique facilities.
The comparability of the other courses listed in the comparable sales approach of both appraisal reports is questionable. The comparables that Zbranek used in the sales comparison approach of his appraisal report are sales that occurred throughout the United States. He did not limit the scope of this analysis to regional sales. Although a typical buyer for a course of the caliber of the subject may be national in nature, it is unknown whether such a purchaser would consider a course located in South Carolina and a course located in the Pacific Northwest to be comparable. The comparable sales that Saunders listed, although they all concerned the sale of property located in the Pacific Northwest, vary widely in type and qualify of golf course.
Despite the high real market value that Saunders determined through the sales comparison approach, a number of the sales included in the comparable table and discussed in the pages following the table reflect the possibility that the RMV is significantly lower than the value that Saunders calculated. A number of the sales that Saunders identified as comparable sold for much less than the $6,300,000 that the appraisal report estimated for the real market value. (Def's Ex A-36 through A-43.)
Both Zbranek and Saunders testified that sales of golf courses do not result in good comparables to be used for the sales comparison approach because of the lack of comparability among golf courses. (Ptf's Ex 1-61; Def's Ex A-44.) Because both appraisal reports placed less weight on the results of the sales comparison approach and the evidence and testimony *Page 23 
demonstrates that good comparables do not exist, this court finds the sales comparison approach less persuasive than the income approach.
 III. CONCLUSION
After a careful review of the testimony and evidence, the court concludes that the 2007-08 real market value of the subject property after reduction for personal property is $4,242,765. Now, therefore,
IT IS THE DECISION OF THIS COURT that the 2007-08 real market value of the subject property identified as Account 00835065 is $4,242,765; and
IT IS FURTHER DECIDED that Defendant shall correct the assessment and tax rolls to reflect the above value. Any refund due following this correction is to be promptly paid with statutory interest.
Dated this day of October 2009.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanner onOctober 29, 2009. The Court filed and entered this document on October29, 2009.
[1] All references to the Oregon Revised Statues (ORS) and Oregon Administrative Rules (OAR) are to 2005.
[2] The difference between the total expenses of the two appraisal reports also includes one additional dollar, which is the result of an error in the addition of the line-item expenses in Defendant's Exhibit B. *Page 1